**MARCUS CABLE ASSOCIATES, L.L.C., etc., Plaintiff,**

v.

**CITY OF BRISTOL, Virginia, etc. Defendant.**

No. 1:02 CV–00197.

United States District Court,
W.D. Virginia,
Abingdon Division.

Dec. 12, 2002.

James N.L. Humphreys, Hunter, Smith & Davis, L.L.P., Kingsport, Tennessee, John C. Dodge, Geoffrey C. Cook and K.C. Halm, Cole, Raywid & Braverman, L.L.P., Washington, D.C., for Plaintiff.

J.D. Bowie, Bristol, Virginia, Steven R. Minor, Elliott Lawson & Pomrenke, Bristol, Virginia, and James Baller, The Baller Herbst Law Group, P.C., Washington, D.C., for Defendant.

Steven R. Minor, Elliott Lawson & Promrenke, Bristol, for Amicus Curiae William C. Wampler, Jr.

## OPINION

JONES, District Judge.

The principal question in this case is whether under Virginia law a municipality may operate a cable television system in competition with private companies. One of the competing cable companies argues that absence additional state legislation, the City of Bristol is legally unable to enter the cable television business. After careful consideration, I agree and will prohibit the City from operating a cable system.

There are important questions that I do not decide. One question is whether cable customers in Bristol are likely to have better and cheaper cable service with additional competition from the City. Perhaps they are. Another question is whether it is fair for a taxpayer-supported entity like the City to compete with private enterprise. Perhaps it is not. Under our system of government, however, these policy questions are for the legislature to decide, and not the courts.

I

Marcus Cable Associates, L.L.C., doing business as Charter Communications (Charter), filed this action on November 18, 2002, seeking declaratory and injunctive relief against the City of Bristol, Virginia, doing business as Bristol Virginia Utilities Board (the City). Charter, the operator of a cable television system by virtue of a franchise from the City, alleged that the City was now preparing to offer cable television services to its residents via a fiber optic network that it has construct-

ed. Charter asserts that the operation of this cable television system by the City is unlawful, both because state law does not grant the City the legal authority to do so, and because the City failed to comply with state law in granting itself a cable franchise. Jurisdiction of this court is based on diversity of citizenship and amount in controversy.[1]

■■■■ After a hearing, the court granted a temporary restraining order on November 22, 2002, prohibiting the City from beginning general operation of its cable television system until a hearing and decision on Charter's request for a preliminary injunction. Thereafter, the parties agreed that their interests and that of the public required an expedited decision and that a trial on the merits could be held in lieu of a hearing on preliminary relief.[2] On December 9, 2002, the court received evidence and argument of counsel and the case was submitted for final decision.[3]

## II

### A

As required by the rules,[4] the following are my findings of fact.

1. Marcus Cable Associates, L.L.C., is a Delaware limited liability company whose sole member is a Delaware entity and whose principal place of business is other than in Virginia. The City of Bristol, Virginia, is a Virginia municipality located in this judicial district. The amount in controversy in this case exceeds, exclusive of interest and costs, the sum of $75,000.

2. Charter operates a cable television system within the City pursuant to a non-exclusive franchise granted by the City dated November 13, 1991, to a predecessor operator. Charter currently serves approximately 5,800 subscribers located in the City. Through its affiliated companies, Charter has 6,000,000 to 7,000,000 subscribers nationwide. Since 1998, Charter has made capital expenditures of $5,000,000 to $9,000,000 for its Bristol system. While another cable television operator, Comcast Communications, operates in the City, Charter and Comcast do not compete in the same geographical areas of the City. In this regard, Bristol is typical of the cable industry in that cable providers generally do not "overbuild" the same geographical areas in smaller markets because of the large capital cost necessary to deliver cable television. The principal competitors to cable television operators are normally local television broadcasters and direct broadcast satellite services.

3. The City has for some time provided electric power, water, and sewer services to its citizens and residents of adjoining areas through its department known as Bristol Virginia Utilities. The department

---

**1.** *See* 28 U.S.C.A. § 1332(a) (West 1993 & Supp.2002).

**2.** The City initially argued that Charter had no standing under state law to contest the City's authority to grant a franchise to a competing cable system. However, the City has now expressly waived any such argument. I have the duty to ascertain sua sponte the standing of a party under the Constitution's grant of power to the federal courts to resolve "cases" and "controversies." U.S. Const. art. III. Since it is clear that Charter will likely suffer actual injury traceable to the City's action and that this injury will be redressed by the court's decision, constitutional standing is present. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

**3.** The City has not filed a formal answer to the Complaint, but in the interest of time the parties stipulated that no such answer would be required and that the defendant was deemed to have denied the substantive allegations of the Complaint.

**4.** *See* Fed.R.Civ.P. 52(a).

is operated by an entity known as Bristol Virginia Utilities Board, which is not independent of the City Council. The City recently constructed a fiber optic network and made plans to provide cable television, telephone, high-speed Internet, and home-security services through this network. On June 11, 2002, the City Council approved an ordinance granting a nonexclusive franchise to Bristol Virginia Utilities Board to construct and operate a cable television system. No public hearing was held with respect to this action, and no prior notice was given to Charter, although the City's plans to provide cable television had been the subject of prior press releases and newspaper articles. Had a hearing been held before the City Council's action, Charter would have appeared and voiced its opposition.

4. The franchise that the City in effect granted to itself differs in significant ways from Charter's franchise. In particular, Charter's franchise contains a pole attachment fee and requirements that the City's franchise recites will be included in a later-negotiated agreement. Charter's franchise contains a detailed definition of gross receipts in order to determine the amount of franchise fees to be paid to the City, while the City's franchise does not contain such a definition.

5. The City initially offered cable television service to a small limited number of subscribers known as "beta testers" and planned to roll out its general cable service beginning December 2, 2002, had not this court enjoined such action. Twenty-seven Charter cable subscribers have already advised Charter that they will leave Charter in order to obtain the City's cable service.

Charter has had experience in other states from municipal overbuilding and generally loses from twenty to thirty percent of its subscribers to the competing municipal operator, which loss is generally permanent. The City's own research indicates that almost three-quarters of residential and business customers surveyed in Bristol in October of 2002 expressed an interest in switching from their current cable or telephone provider to the City.

B

The City concedes that no provision of Virginia law *expressly* grants it authority to engage in the cable television business. It argues, however, that it has *implied* authority to do so.

Virginia, like some other states, follows the so-called Dillon Rule, named after John Dillon, a judge of the Iowa Supreme Court, who first proposed it in 1868.[5] As formulated in Virginia, the Dillon Rule establishes that political subdivisions of the Commonwealth, such as cities, have only those powers expressly granted by state law or necessarily implied from express powers.[6] When doubtful, the question of whether a municipality has a particular power must be answered in the negative.[7] The Dillon Rule, in short, requires a narrow and strict interpretation of all powers conferred on local government in Virginia.

While the Virginia legislature has authorized localities to establish and operate "waterworks, sewerage, gas works (natural or manufactured), electric plants, public mass transportation systems, storm-water management systems and *other public utilities*,"[8] I agree with the most recent

---

5. *See Merriam v. Moody's Ex'rs,* 25 Iowa 163, 170 (1868).

6. *See City of Virginia Beach v. Hay,* 258 Va. 217, 518 S.E.2d 314, 316 (1999).

7. *See City of Richmond v. Confrere Club of Richmond, Va., Inc.,* 239 Va. 77, 387 S.E.2d 471, 473 (1990).

8. Va.Code Ann. § 15.2–2109(A) (Michie Supp. 2002) (emphasis added).

opinion of the Attorney General of Virginia that these words do not necessarily imply the operation of a cable television system since such systems have not "historically been provided by Virginia local government, and ... are clearly not within the common meaning of the term 'public utility.' " [9] That is clearly the weight of authority in other Dillon Rule states.[10] As noted by the Supreme Court of South Carolina, such services cannot be included within the definition of a public utility because "the value and necessity of cable television is [not] so self-evident that this court should declare that a cable television system provides an essential service." [11] Nor does the federal Cable Act grant any express power to localities to operate a cable system.[12] While the City's charter from the legislature authorizes it to operate a "utility," [13] I reject the argument by the City that any broader scope of power is implied by that word as compared to the words "public utility."

■ There is an additional statute of general application that provides localities the authority to exercise functions "necessary or desirable to secure and promote the general welfare." [14] This statute is limited, however, to those powers granted by state law.[15] Otherwise, there would be no limit to the powers of a municipality. If the City's argument based on this statute were correct, it could legally operate grocery stores, pharmacies, movie theaters, pet-grooming businesses, and more, since all of these enterprises doubtless provide "desirable" services.

■ In 2002 the Virginia legislature adopted a statute allowing localities to offer "qualifying communications services" subject to the approval of the State Corporation Commission.[16] The City does not rely on this statute and has not sought approval by the Commission for its proposed cable services. Nevertheless, it points to the statute's legislative history showing that an earlier version not enacted contained language expressly excluding cable television from the definition of "qualifying communications services." Relying on a declaration by William C. Wampler, Jr., a Virginia state senator whose district includes Bristol and who was the sponsor of the legislation, the City argues that the removal of the exclusion language shows a recognition by the legislature that municipalities have the existing power to offer cable services. Charter in turn has filed a declaration by an industry lobbyist disputing such intent.

**9.** 1995 Va. Op. Att'y Gen. 93, 1995 WL 370732, at *1 (1995) (Attorney General James S. Gilmore, III).

**10.** *See* Steven C. Carlson, *A Historical, Economic, and Legal Analysis of Municipal Ownership of the Information Highway,* 25 Rutgers Computer & Tech. L.J. 1, 54–55 (1999) (discussing cases). My opinion in *City of Bristol v. Earley,* 145 F.Supp.2d 741 (W.D.Va.2001), is not to the contrary. In that case, the issue was whether the state legislature could expressly prohibit a locality from providing telecommunications services in the face of federal legislation to the contrary. I found that the City had the power to sue to enforce its federal right because it was expressly authorized by state law to provide telephone services. *Id.* at 745. No issue involving the power to provide cable television under the Dillon Rule was presented in that case.

**11.** *Sheppard v. City of Orangeburg,* 314 S.C. 240, 442 S.E.2d 601, 603 (1994).

**12.** *See Warner Cable Communications, Inc. v. Borough of Schuylkill Haven,* 784 F.Supp. 203, 213–14 (E.D.Pa.1992).

**13.** 1990 Va. Acts ch. 542 § 2.04(8).

**14.** Va.Code Ann. § 15.2–1102 (Michie 1997).

**15.** *Id.*

**16.** Va.Code Ann. § 56–484.7:1 (Michie Supp. 2002).

State legislative history is often of low reliability in statutory construction because of the absence of verbatim reports of debates and floor statements.[17] While the statements of a principal sponsor as to the meaning of legislation may be helpful, it is those statements made to the legislature *before* adoption of the legislation that are relevant, since such remarks may illuminate the legislature's intent in passing the bill.[18] Under the circumstances, I cannot find any unambiguous meaning in the legislature's exclusion of the language in question.[19]

■ The City also cites another new provision of state law authorizing localities that operate electrical distribution systems (as the City does) to offer "telecommunications services" after obtaining a certificate of public convenience and necessity from the State Corporation Commission.[20] The Commission is empowered to grant such a certificate to a locality that "propos[es] to furnish local exchange telephone service in the Commonwealth." [21] The new statute also provides that "[n]o locality providing such services shall acquire by eminent domain the facilities or other property of any telecommunications service provider to offer cable, telephone, data transmission or other information or online programming services." [22] The parties dispute the meaning of this language and I cannot find that it clearly indicates a recognition that

Virginia law permits localities to offer cable services.

## C

In summary, I find that the Dillon Rule prohibits the City from operating a cable television system.[23] It can doubtless be argued that localities in Virginia ought to be freed from the restrictions of this nineteenth century legal formulation and the citizens of Bristol allowed to decide if they want their local government to engage in cable television services. However I might feel personally about the wisdom of existing legal rules, I am bound to apply them. Nevertheless, the City has a direct if uncertain remedy—it can ask Virginia's General Assembly and Governor to adopt legislation that plainly authorizes it to operate a cable television system.

## D

For the foregoing reasons, I reach the following conclusions of law.

1. The court has jurisdiction of the subject matter of this case and of the parties;

2. An actual controversy exists as to the City's legal authority to operate a television cable system under Virginia law;

3. Charter is likely to suffer actual and substantial harm in the event the City

---

17. *See* William N. Eskridge, Jr., et al., *Legislation and Statutory Interpretation* 297 (2000).

18. *See United Steelworkers of Am., AFL–CIO–CLC v. Weber*, 443 U.S. 193, 241, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting).

19. *See* Eskridge, *supra* note 17, at 305 (discussing authority that rejected-proposal evidence is unpersuasive if "the reasons for rejection were unclear.").

20. Va.Code Ann. § 15.2–2160 (Michie Supp. 2002).

21. Va.Code Ann. § 56–265.4:4 (Michie Supp. 2002).

22. Va.Code Ann. § 15.2–2160(E) (Michie Supp.2002).

23. Since I find that the City is not authorized to operate a cable television system, it is unnecessary for me to determine the other grounds asserted as to the invalidity of the City's action.

operates a television cable system in competition with Charter;

4. The City does not have the legal authority to operate a television cable system because such authority is not expressly granted by Virginia law or necessarily implied from such express powers so granted; and

5. Charter is entitled to a declaratory judgment and an injunction prohibiting the City from operating a cable television system.

A separate judgment in accord with this opinion will be entered herewith.